# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### WICHITA FALLS DIVISION

| | | |
|---|---|---|
| JANIS L. BROWN, Individually and as | § | |
| Personal Representative of the Estate of | § | |
| JASON RAY BROWN, Deceased, and | § | |
| BILLY RAY BROWN, | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| WICHITA COUNTY, TEXAS, THOMAS | § | 7:05-CV-0108-O-KA |
| J. CALLAHAN, Sheriff of Wichita County, | § | |
| Texas, in his Individual and Official | § | **ECF** |
| Capacity, DANIEL H. BOLIN, M.D., in | § | |
| his Individual and Official Capacity, | § | |
| KAYE KRAJCA, in her Individual and | § | |
| Official Capacity, MICHELLE GEORGE, | § | |
| in her Individual and Official Capacity, | § | |
| ROSE INGRAM, in her Individual and | § | |
| Official Capacity, DICKEY LEE SOURS, | § | |
| JR., in his Individual and Official | § | |
| Capacity, BLAINE GREENE, in his | § | |
| Individual and Official Capacity, WILLIAM | § | |
| YEAGER, in his Individual and Official | § | |
| Capacity, GARY WHATLEY, in his | § | |
| Individual and Official Capacity, JAMES | § | |
| GEARY, in his Individual and Official | § | |
| Capacity, WESLEY DICKERMAN, in | § | |
| his Individual and Official Capacity, and | § | |
| WAYNE PARISH, in his Individual | § | |
| and Official Capacity, | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the following:

1. Defendant Thomas J. Callahan's Motion for Summary Judgment (Doc. # 126);

2. Plaintiffs' Response to Callahan's Motion for Summary Judgment (Doc. # 127);

3. Plaintiffs' Brief in Support of their Response (Doc. # 127);

4. Defendant Thomas J. Callahan's Reply (Doc. # 128);

5.  The parties' Joint Appendix (Doc. # 129);

6.  Defendant Thomas J. Callahan's Response to Plaintiffs' Objections to Evidence (Doc. # 130); and

7.  Defendant Thomas J. Callahan's Ojections to Plaintiffs' Summary Judgment Evidence (Doc. # 131).

Having reviewed the relevant briefing, evidence, and applicable law, the Court finds as follows:

I.      Background

Plaintiffs are the relatives and personal representative of the Estate of Jason Brown ("Brown").  Doc. # 1 (Compl.).  Plaintiffs bring claims against Wichita County, jail physician Dr. Bolin, Wichita County Sheriff Thomas Callahan, jail nurses, and jail detention officers arising out of Brown's death at a Wichita County jail facility.  Doc. # 86 (Amd. Compl.).

Jason Brown was arrested on a drug charge and brought to the Wichita County jail on July 22, 2004.  Jt. App. at 203.  En route to the jail, Brown began crying and pleaded with the arresting officer to release him because he had medical problems and did not have long to live. *Id.* at 208.  The arresting officer advised the jail staff upon arrival at the jail of Brown's medical problems.  *Id.*  After intake procedures were completed, Brown was put in the general inmate population.  *Id.*

Around 11:42 p.m. on July 23, 2004, someone in the general population tank pushed the emergency button and notified the control room that an inmate had thrown up blood.  *Id.* at 94. Detention officers Dickey Lee Sours, Jr. and Blaine Greene responded to the call.  *Id.* at 207-08. Detention officer Sours reported that he found Brown laying on his side next to a puddle of blood 1 to 1.5 feet in width and 2 to 2.5 feet in length, with chunks of food in the puddle. *Id.* at

162.  Detention officer Greene reported that the officers saw a big puddle of blood.  *Id.* at 170.

Nurse Krajca was called and told of the situation, and over the phone, Krajca asked the detention

officers to give Brown some liquid antacids.  *Id.* at 162.

Later, Brown complained that he was in pain and begged for help.  *Id.*  Krajca was again

called, and asked "did anyone actually see him (Brown) throw up the blood?"  *Id.*  Sours

responded, "Kaye (Krajca), I had to clean it up."  *Id.*  Krajca advised that Brown should be given

suppositories, but Brown would not take them.  *Id.*  Krajca was called again and told that Brown

was not coherent.  *Id.*  Krajca then went to the jail to visit Brown.  *Id.*

There is a dispute in the evidence regarding what happened next.  There is evidence

suggesting that Brown told Nurse Krajca he had nausea and vomiting, and also informed her that

he had several medical problems including auto immune chronic hepatitis A, B, and C,

esophageal varies, jaundice, spleenial magaly, and anemia.  *Id.* at 184, 205.  However, there is

also evidence indicating that Nurse Krajca could not get Brown to respond.  *Id.* at 162.

There is no dispute that Krajca then had Brown moved to medical solitary, and gave

Brown suppositories.  *Id.* at 162, 183, 205.  Later, during a cigarette break, Nurse Krajca asked

Sours "[d]o you know what kind of ass chewing I would get from Dr. Bolin if I sent him

(Brown) to the hospital in the good health that he is in?"  *Id.* at 162, 208.

On Saturday, July 24, 2004, between 3:12 a.m. and 11:30 p.m., detention officers

allegedly monitored Brown through a slot in the cell door.  At approximately 11:30 p.m., Brown

was found unresponsive and pulseless by the two officers.  *Id.* at 183, 184, 190, 203.  Nurse

Krajca advised the officers to call emergency services.  *Id.* at 183.  The medical response team

reported that Brown had expired quite some time prior to arrival.  *Id.* at 201.  The autopsy report

indicates that Jason Brown died from a massive gastrointestinal hemorrhage at the age of 26.  *Id.*
at 222.

Plaintiffs filed suit on June 8, 2005, bringing claims against jail nurses, detention
officers, the jail physician, Wichita County, and Wichita County Sheriff Thomas Callahan.
Compl.  Plaintiffs allege that Defendant Callahan violated Plaintiffs' rights under the Fourteenth
Amendment by adopting and/or condoning unconstitutional policies and by failing to train and
supervise jail staff, causing Brown's death.  Amd. Compl.

On February 29, 2009, Defendant Callahan filed his motion for summary judgment as to
Plaintiffs' claims asserted against him in his individual capacity.  Callahan argues that Plaintiffs
have no evidence demonstrating that Callahan violated constitutional rights and that he is
entitled to qualified immunity.  Plaintiffs respond that Defendant Callahan's motion for summary
judgment has failed to address the claims that have been levied against him, and that Plaintiffs
have produced ample summary judgment evidence.

The issues have been briefed and this matter is ripe for determination.

II.    Legal Standard

Summary judgment is proper when the pleadings and evidence on file show that no
genuine issue exists as to any material fact and that the moving party is entitled to judgment as a
matter of law.  FED. R. CIV. P. 56(c).  "[T]he substantive law will identify which facts are
material."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine issue of
material fact exists "if the evidence is such that a reasonable jury could return a verdict for the
non-moving party."  *Id.*  The movant makes a showing that there is no genuine issue of material
fact by informing the court of the basis of its motion and by identifying the portions of the record

4

which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24.  To carry this burden, the "opponent must do more than simply show. . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249.  Neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).  The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  Summary judgment in favor of the defendant is proper if, after adequate time for discovery, the plaintiff fails to establish the existence of an element essential to his case and to which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

When weighing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988).  The Court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255.  As long as there appears to be some support for the disputed allegations such

5

that "reasonable minds could differ as to the import of the evidence," the motion for summary

judgment must be denied.  *Id.* at 250.

III.    Analysis

Defendant Callahan moves for summary judgment on Plaintiffs' claims for violations of

the Fourth and Fourteenth Amendments, brought pursuant to 42. U.S.C. § 1983, asserted against

Callahan in his individual capacity.  To state a claim under 42 U.S.C. § 1983, a plaintiff must

demonstrate: (1) a violation of the United States Constitution or of federal law; and (2) that the

violation was committed by someone acting under color of state law.  *See Attenberry v. Nocona*

*Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005).  In this case, Plaintiffs' claim that Defendant

Callahan, sheriff of Wichita County, violated Plaintiffs' Fourth and Fourteenth Amendment

rights by denying Brown adequate medical care.  Defendant Callahan argues that Plaintiffs have

failed to establish any constitutional violation and that, even assuming such a violation, he is

entitled to qualified immunity.

The doctrine of qualified immunity protects government officials sued pursuant to § 1983

"from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."  *Pearson v.*

*Callahan*, ___U.S.___, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)).  Qualified immunity balances two important interests - the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officials

from harassment, distraction, and liability when they perform their duties reasonably.  *Id.*  This

doctrine protects "all but the plainly incompetent or those who knowingly violate the law."

*Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Courts generally apply the two-pronged analysis established in *Saucier v. Katz*, 533 U.S. 194 (2001), in determining whether a government official is entitled to qualified immunity for an alleged constitutional violation.  The first prong of the *Saucier* analysis asks whether, taken in the light most favorable to plaintiff, the facts alleged show that the official's conduct violated a constitutional right.  *See Scott v. Harris*, 550 U.S. 372 (2007) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).  Under *Saucier*, if, and only if, the Court finds a violation of a constitutional right, the Court then asks whether the right was clearly established in light of the specific context of the case.  *Id.*  If there is evidence to support the violation of a constitutional right, the Court asks whether, nevertheless, qualified immunity is appropriate because defendant's actions were objectively reasonable "in light of clearly established law at the time of the conduct in question." *Hampton Co. Nat'l Sur., L.L.C. v. Tunica County, Miss.,* 543 F.3d 221, 225 (5th Cir. 2008).

The Supreme Court has recently clarified that it is no longer mandatory for courts to consider the two prongs set out in *Saucier* in order, although the Court noted that it may be beneficial to do so.  *Pearson,* 129 S.Ct. at 815.  Under *Pearson*, courts are now permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  *Id.*

The usual summary judgment burden of proof is altered in the context of a defense of qualified immunity.  *See Gates v. Texas Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008).  An official need only plead his or her good faith, which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law.  *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)).  To negate

a defense of qualified immunity and avoid summary judgment, the plaintiff need not present "absolute proof," but must offer more than "mere allegations." *Ontiveros v. City of Rosenburg, Tex.,* No. 08-20081, 2009 WL 807450 at *2 (5th Cir. Mar. 20, 2009).

Defendant Callahan pleaded the affirmative defense of qualified immunity. At the summary judgment stage, a determination of whether a constitutional right was violated overlaps substantially with the determination of whether the first prong of the qualified immunity analysis is satisfied. Accordingly, the Court first addresses whether Plaintiffs have raised a genuine issue of material fact that Defendant Callahan violated Brown's rights under the Fourth and Fourteenth Amendments, and then considers whether Defendants' actions were objectively unreasonable.

A.    **Plaintiffs' Fourth Amendment claims**

Defendant Callahan moves for summary judgment on Plaintiffs' section 1983 claims under the Fourth Amendment. Callahan argues that since Brown was a pretrial detainee at the time of the alleged constitutional violation, the Fourth Amendment is inapplicable. In their response, Plaintiffs state that they agree the events leading up to the death of Brown do not support a claim for Fourth Amendment violations.

Accordingly, the Court finds that summary judgment is appropriate with respect to Plaintiffs' claims against Defendant Callahan for violation of the Fourth Amendment.

B.    **Plaintiffs' Fourteenth Amendment claims**

Defendant Callahan also asserts that he is entitled to summary judgment with respect to Plaintiffs' section 1983 claims based on violation of the Fourteenth Amendment. Callahan notes that he was not aware that Brown was in the Wichita County jail, did not have any information

regarding Brown, and could not have been deliberately indifferent to Brown.

The Fifth Circuit has recognized a pretrial detainee's Fourteenth Amendment right not to have his serious medical needs met with deliberate indifference by jail officials.[1]  *Hare v. City of Cornith, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996).  A prison official acts with deliberate indifference only if the official (A) knows that the inmate faces a substantial risk of serious bodily harm and (B) disregards that risk by failing to take reasonable measures to abate it. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  Mere negligence will not suffice, and deliberate indifference cannot be inferred from a failure to act reasonably.  *See Hare*, 74 F.3d at 649-50.  Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.  *Id.; Gobert*, 364 F.3d at 347; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999).  Deliberate indifference requires a showing that officials refused to treat the detainee, ignored his complaints, intentionally treated him incorrectly, or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs.  *Domino v. Tex. Dept. of Criminal Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

The undisputed evidence shows that Defendant Callahan did not know inmate Brown and had no contact with Brown while he was at the Wichita County jail facilities.  Accordingly, Plaintiffs have failed to establish Callahan is liable under § 1983 based on any direct interaction with, or knowledge of, inmate Brown.

---

[1] Because Plaintiffs complain that jail personnel provided inadequate medical care, this case is an episodic act or omission claim, which requires Plaintiffs to show Defendants acted with deliberate indifference.  *See Hare*, 74 F.3d at 645.

Even though there is no evidence that Callahan interacted directly with or had knowledge of Brown during his incarceration, Callahan may still be held personally liable, under certain circumstances, for acts or omissions due to his role as supervisor at the Wichita County jail. Supervisory liability may exist without an official's overt personal participation in a direct offensive act where an official implements, adopts, or maintains a custom or policy that is so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation. *See Cozzo v. Tangipahoa Parish Council-President Gov't*, 279 F.3d 273, 289 (5th Cir. 2002). An official policy is:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by [the government entity] . . . or by an official to whom the [entity] ha[s] delegated policy-making authority; or

2. A persistent, widespread practice of . . . officials or employees, which , although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represent [the entity's] policy.

*Id*. (citing *Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir. 1992)). A plaintiff may also establish a custom or policy based on an isolated decision made in the context of a particular situation if the decision was made by an authorized policymaker in whom final authority rested regarding the action ordered. *Id.; City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988); *Bennett v. Pippin,* 74 F.3d 578, 586 (5th Cir. 1996).

A supervisor may also be held liable under § 1983 for failure to properly supervise and train subordinate officers who cause a deprivation of constitutional rights. *Wever v. Lincoln County*, 388 F.3d 601, 606-607 (8th Cir. 2004). The plaintiff must show that (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of plaintiff's rights; and (3) the failure to train or

supervise amounts to deliberate indifference.  *Id.* at 911-12 (citing *Hinshaw v. Doffer*, 785 F.2d

1260, 1263 (5th Cir. 1986)).  "[T]he misconduct of the subordinate must be affirmatively linked

to the action or inaction of the supervisor."  *Southard v. Tex. Bd. Of Criminal Justice*, 114 F.3d

539, 550 (5th Cir. 1997).  Only the direct act or omission of the supervisory official will give rise

to individual liability under § 1983; a supervisor may not be held individually liable under a

theory of *respondeat superior*.  *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 534 (5th

Cir. 1997).

Plaintiffs argue that they have produced evidence that Callahan implemented and/or

condoned unconstitutional policies and failed to train and supervise subordinates at the jail,

causing Brown's death.  Amd. Compl.  Defendant Callahan argues that Plaintiffs have failed to

produce any evidence in support of these allegations, and  notes that jail staff receive the

appropriate level of state-mandated training, precluding liability for failure to train.

The Court now considers whether Plaintiffs have raised a genuine issue of material fact

regarding whether Callahan implemented or adopted an unconstitutional policy.

**1.      Policy or Custom**

Plaintiffs allege that Defendant Callahan ratified Defendant Bolin's pattern and practice

of harassing and intimidating jail nurses when they would call him with questions regarding

nursing care, discouraging sending sick inmates to the hospital, causing Brown's death.  In

support of this assertion, Plaintiffs offer evidence including affidavits from two former jail

nurses, the testimony of Defendant Callahan, and evidence suggesting that Nurse Krajca

believed she would have been reprimanded for sending Jason Brown to the hospital.

11

### a.      Affidavits of Former Jail Nurses

Plaintiffs have submitted affidavits from former jail nurses Pathena Dawn Tweed and Dawn Marie Wilkinson.[2]  *Id.* at 559-62.  Both nurses averred that they have personally observed Dr. Bolin berate jail nurses who called him for medical instruction or direction, and that Dr. Bolin's demeanor intimidated the nurses working under him.  *Id.*  Both nurses further avered that they personally feared calling Bolin for fear of unwarranted criticism.  *Id.*

Ms. Tweed and Ms. Wilkinson further averred that they perceived that Dr. Bolin did not want inmates being sent to the emergency room because it would be Dr. Bolin's responsibility to then go to the hospital to provide care for the inmate.  Wilkinson stated that she personally experienced this when a female inmate complained of abdominal pains, and reported that she had been raped prior to being arrested and detained.  Wilkinson stated that she inspected the inmate, and discovered that the inmate had a tampon lodged deep into her body that neither she nor the inmate could remove.  Wilkinson further averred that she recognized the situation required immediate medical attention, so she called Dr. Bolin for medical instruction, but was advised not to send the inmate to the emergency room and to remove the tampon herself.  Wilkinson stated that she disobeyed Dr. Bolin's instruction, calling an ambulance and driving her own vehicle to the hospital to be with the inmate.  *Id.*

Ms. Tweed averred to a similar situation involving an inmate with very low blood sugar.

---

[2]  Sheriff Callahan moves to strike these affidavits, arguing that the affidavits consist of conclusory testimony containing information outside the affiants' personal knowledge that should be excluded and stricken pursuant to Rule 602 of the Federal Rules of Evidence.  Callahan also argues that the affidavits contain hearsay.  The Court finds that, while the affidavits submitted by Plaintiffs contain a few statements properly characterized as hearsay and speculation, the Court may consider those non-hearsay statements within the affidavits that are based on the affiants' personal knowledge.  Accordingly, the Court declines to strike these affidavits in whole, but does not consider hearsay or speculation.

Tweed stated that she called Dr. Bolin for instruction regarding the inmate and that Dr. Bolin informed her not to send the inmate to the emergency room "under any circumstances," advising Ms. Tweed to take whatever other action she believed necessary to bring the inmates blood sugar levels up.  Tweed stated that after several failed attempts to raise the inmate's blood sugar level, she had the inmate transported to the hospital for emergency treatment.  Tweed stated that, upon learning of her decision to send the inmate to the emergency room, Dr. Bolin became very irate, yelled at Ms. Tweed, and questioned why she had defied his orders.  *Id.*

Ms. Tweed and Ms. Wilkinson both averred that they spoke with Sheriff Callahan about Dr. Bolin's treatment of them and other nurses, but that they were advised something to the effect that "this is just the way he (Bolin) is" and were instructed to ignore Bolin's behavior.  *Id.*

**b.      Callahan's Testimony**

Plaintiffs have produced Defendant Callahan's deposition testimony, including testimony in which he acknowledges that he received complaints regarding Bolin's treatment of employees at the jail.  Specifically, Callahan testified that he heard that Bolin gripes all the time at employees, including the nurses.  *Id.* at 374.  Callahan stated that he had been told that Bolin is grumpy when he is awakened in the middle of the night, and that Bolin doesn't like to be bothered.  *Id.* at 374-75.  Callahan testified that this is a common reputation that Bolin has among nurses.  *Id.* at 375.  Callahan further testified that nurses were told to ignore this, and to call Bolin any time that they need to.  *Id.*  Callahan stated that he has spoken with Bolin about this two or three times over the past ten to twelve years, and that Callahan told Bolin to "sweeten up" and "get a little nicer."  *Id.* at 375-76.

**c.      Evidence regarding Brown's death**

13

Plaintiffs have produced evidence suggesting that Nurse Krajca violated Plaintiffs'

constitutional rights by denying Brown adequate medical treatment.  *See* Doc. # 153,

Memorandum Opinion and Order resolving Krajca's motion for summary judgment, entered

May 20, 2008.  The Court has found that disputed evidence suggests that Nurse Krajca was

aware that Brown had serious medical conditions including hepatitis A, B, and C, esophageal

varices, jaundice, spleenial magaly, and anemia; that Brown regurgitated blood and was

complaining of gastric ulcers; and that Brown was incoherent and unresponsive; but that in spite

of this knowledge, Krajca merely treated Brown for nausea and placed Brown in an isolated cell

rather than securing emergency medical services.  *Id.*  Plaintiffs have also produced evidence

suggesting that Nurse Krajca believed she would have received a reprimand from Dr. Bolin for

sending Brown to the hospital.  Jt. App. at 162.

### d.     Moving Force

The Court finds, based on the evidence discussed above, that Plaintiffs have produced

evidence raising a genuine issue of material fact regarding whether Dr. Bolin engaged in a

widespread practice or custom of intimidating nurses and discouraging nurses from seeking

emergency care for inmates with serious medical needs.  The evidence also raises issues of fact

as to whether Defendant Callahan was aware of and adopted or maintained the custom or policy

of nurse intimidation.  Callahan testified that he was aware that Bolin "gripes all the time" at

employees, and that Bolin has a common reputation for not wanting to be bothered.  In addition,

while the affidavits of Pathena Tweed and Dawn Wilkinson do not set out specifically what

information was given to Sheriff Callahan regarding Dr. Bolin's treatment of nurses, it is

reasonable to infer that Sheriff Callahan was told about the specific incidents noted in the

affidavits, including details concerning treatment of the inmate with low blood sugar and the inmate that had been raped.  The Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant, and therefore finds the affidavits raise an issue of fact regarding whether Callahan was aware that Dr. Bolin intimidated nurses and discouraged them from seeking emergency care for inmates with serious medical needs  *See Walker,* 853 F.2d at 358.

In addition, there is evidence suggesting that the alleged policy or custom of nurse intimidation is itself is a repudiation of constitutional rights and is the moving force of the constitutional violations complained of here.  *See Cozzo*, 279 F.3d at 289.  There is evidence that Nurse Krajca believed she would have received an "ass chewing" from Dr. Bolin had she sent inmate Brown to the hospital, raising a genuine issue of fact regarding whether Nurse Krajca realized that Brown was in need of medical attention, but failed to provide such attention because of Dr. Bolin's policy or custom of discouraging nurses from seeking emergency care for inmates with serious medical needs.  The Court finds that this evidence raises genuine issues of material fact regarding whether a policy of nurse intimidation was adopted by Defendant Callahan, and was a moving force behind violation of Brown's constitutional rights.

Defendant Callahan argues that because Wichita County had a Health Services Plan in place that was approved by the Texas Commission on Jail Standards, Callahan cannot be held liable.  The Court does not find that mere adoption of an approved health services plan insulates one from liability, particularly where evidence raises issues regarding whether that plan was followed.  *See* Defendant's Brief (stating that the Wichita County health services plan requires procedures for efficient and prompt care for acute and emergency situations).

### 2.     Failure to Supervise or Train

Defendant Callahan also argues that summary judgment is appropriate because Plaintiffs have not produced any evidence of any failure to supervise or train jail staff.  Callahan notes that the jail staff receive the appropriate level of state-mandated training.

Plaintiffs allege that Defendant Callahan permitted the jail nurses to act outside their nursing authority by allowing them to assess, diagnose, unlawfully prescribe medications, act as on-call nurses, and make final treatment decisions.  Plaintiffs also allege that Defendant Callahan failed to enforce the professional services contract entered into between Bolin and Wichita County.  Plaintiffs argue that this lack of supervision created the dangerous environment that resulted in Brown's death.  In support of these allegations, and in addition to the evidence discussed above, Plaintiffs have produced the testimony of Defendants Bolin and Callahan, and also point the Court to the professional services contract between Dr. Bolin and Wichita County.

### a.     Callahan's Testimony

Callahan testified that the County delegated responsibility to Dr. Bolin for inmate health care, and that it was the expectation of the Sheriff's Office that Bolin would supervise the professional activities of the jail nursing staff.  *Id.* at 349-56.  Callahan stated that, while he has the power to hire and fire nurses, Bolin is responsible for supervising the nurses' provisioning of medical care.  *Id.*  Defendant Callahan stated that if the jail physician was not supervising the nurses in their professional activities, then there was no one at the jail supervising the nurses in their professional activities. *Id.* at 358.  Additionally, as discussed above, the Sheriff testified that when jail nurses complained about Dr. Bolin's treatment of them, Callahan handled the situation by telling Bolin to "sweeten up" and to "get a little nicer" and by instructing jail nurses

to put up with it.  *Id.* at 375-76.

**b.      Bolin's Testimony**

In contrast to Callahan's testimony, Dr. Bolin testified that he is not the jail nurses' supervisor, and that the sheriff is.  *Id.* at 319-20.  Dr. Bolin stated that he only supervises jail nurses when he is physically present at the jail facilities or if the nurses call him on the phone, and does not supervise nurses otherwise.  *Id.* at 318-19.

Bolin testified that he was not Nurse Krajca's employer, but that if he was, he would have discussed with her in depth the problems with the way she handled inmate Brown's medical treatment.  *Id.* at 312.  Bolin testified that a puddle of blood 1 to 1.5 feet by 2 to 2.5 feet is a significant amount of blood, and that he would be critical of Krajca for not sending Brown to the hospital.  *Id.* at 309-10.

**c.      Professional Services Contracts**

Plaintiffs have produced the service contract between Dr. Bolin and Wichita County, which provides that "[t]he Contractor (Bolin) will supervise the professional activities of the Jail Nursing Staff" and that "[i]n all other matters, the Sheriff will supervise these persons."  *Id.* at 58.  The contract also states that "[t]he Contractor (Bolin) shall provide medical care for inmates needing emergency treatment in the emergency room and medical treatment when admitted to the hospital" and that "emergency care will also cover 24 hour telephone coverage by a licensed physician."  *Id.* at 56.

**d.      Evidence of failure to supervise**

The Court finds that Plaintiffs have produced evidence raising a genuine issue of material fact regarding whether Defendant Callahan failed to supervise the jail medical staff.  Plaintiffs

17

have produced evidence that suggests that jail nurses were completely unsupervised in providing

medical care whenever Dr. Bolin was not physically present at the jail.[3]  In addition, there is

evidence suggesting that Defendant Callahan, who is responsible under state law for the safety of

inmates at the Wichita County jail,  responded to evidence of nurse intimidation by speaking

with Bolin two or three times over the course of ten or twelve years, asking Bolin to "sweeten

up" and by telling the jail nurses to put up with it.  Jt. App. at 375-76; TEX. LOCAL GOV'T CODE

ANN. § 351.041(a) (Vernon Ann. 2007).  The Court finds this evidence raises genuine issues of

fact regarding whether Callahan failed to supervise the jail medical staff.[4]

     **e.**     **Causal Link**

Further, the Court finds that Plaintiffs have produced evidence suggesting a causal link

exists between Callahan's failure to supervise and violation of constitutional rights.  As noted

above, there is evidence suggesting that Callahan failed to properly supervise Dr. Bolin after

becoming aware that Dr. Bolin intimidated nurses and discouraged them from seeking

emergency care for seriously ill inmates.  In addition, there is evidence suggesting that Dr.

Bolin's opposition to nurses seeking emergency care for sick inmates resulted in nurses,

specifically Nurse Krajca, not calling Dr. Bolin or transporting inmate Brown to the hospital,

---

[3]  The Court notes that Dr. Bolin testified that he was only present at the jails during "doctor's call" which generally occurred three times a week - on Mondays and Thursdays at the annex facility, and on Wednesdays at the downtown jail facility.  Jt. App. at 290-91.  Bolin testified that he estimates that he spends 25-33% of his time working for Wichita County, spending the rest of his time in private practice. *Id.*

[4]  Plaintiffs also allege Callahan is liable for failure to train jail staff, but have failed to produce any evidence of specific training deficiencies.  While Plaintiffs have produced evidence suggesting that nurses performed duties without proper supervision, and arguably the nurses would not have needed supervision had they received advanced training, the Court finds that Plaintiffs' claims are properly considered claims for failure to supervise jail staff.

even though Brown had serious medical needs requiring attention, and Krajca was aware of these needs.  The Court finds that this evidence demonstrates that there is a fact issue regarding whether Callahan's failure to supervise the jail medical staff resulting in violation of Plaintiffs' rights.

### f.   Deliberate Indifference

Finally, the Court finds that Plaintiffs have produced evidence suggesting that Callahan's failure to supervise amounts to deliberate indifference.  Fact issues exist regarding whether Defendant Callahan knew that Dr. Bolin engaged in a practice of intimidating nurses and discouraging them from seeking emergency care for inmates with serious medical needs, but failed to take appropriate supervisory measures.  To the extent a custom of nurse intimidation existed, and Callahan was aware of the custom, the Court finds that the obviousness of the risk of harm from such a custom is sufficient to raise a fact issue regarding whether Callahan was aware of facts from which the inference could be drawn that his failure to supervise posed a substantial risk of serious harm to inmates.  In addition, the obviousness of the risk of harm also creates a genuine fact issue regarding whether Defendant Callahan in fact drew the inference that his failure to supervise would cause harm.  *See Smith*, 158 F.3d at 912; *Farmer*, 511 U.S. at 842 (stating that a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious).

Callahan repeatedly points out in his briefing that detention officers Sours and Greene were not medically qualified to determine whether the large puddle of vomit found next to Jason Brown on July 23, 2004 contained blood.  Def's Brief at 3-4, 13-14, 18, 20-21.  While Sours and Greene made statements shortly after Brown's death indicating that they found Brown lying next

to a large puddle of blood and reported this to Nurse Krajca, Callahan submits affidavits from these detention officers, executed several years after the events in question, in which Sours and Greene aver that they do not know if the vomit actually contained any blood and are not qualified to make such a determination since they have no formal medical training.  Jt. App. at 94 (Greene's affidavit, dated October 24, 2007, indicating he has no formal training enabling him to tell whether vomit contains blood); 103 (Sours' affidavit, dated October 24, 2007, stating same); 162-63 (Sours Memo, dated August 3, 2004, stating that he saw a large puddle of blood on the floor next to Brown's bunk, and that he then asked Brown "what could have caused him to throw up blood"); 170 (handwritten memo from Greene, requested the day after Brown's death by Callahan, Chief Yoder, and the Texas Rangers, stating that "[w]hen we got there we seen (sic) a big puddle of blood on the floor").

Defendant Callahan also discusses at length the expert testimony of Dr. Browne, who testified that inmates often test the jail system by feigning illness for secondary gain.  Def's Brief at 17-21.  Defendant argues, based on this opinion, that "many of the jail inmates feel that medical (sic) can just get them out of jail much like a judge dismissing charges and releasing them."  *Id.* at 18.

Defendant Callahan appears to argue that Nurse Krajca and the jail staff were entitled to ignore that Brown may have thrown up blood because no one with medical training confirmed that Brown had vomited up blood and also because inmates lie.  Defendant appears to suggest that the jail had a policy of disregarding inmates' medical complaints as fabrications unless a nurse or doctor could personally verify the complaints.

That the jail had such a policy is suggested by the testimony of Nurse Ingram, another

Wichita County jail nurse.  Jt. App. at 394.  Nurse Ingram testified that if an inmate was complaining to her or another nurse at Wichita County that he had thrown up blood, the complaint itself is not enough to warrant contacting the doctor unless she or another nurse actually saw the blood.  *Id.*  Nurse Ingram stated that, although Jason Brown complained to Nurse George at book-in that he was vomiting up blood, Nurse George had no obligation to review Brown's medical history forms, which stated that he had esophageal varices.  *Id.*  Nurse Ingram acknowledged that esophageal varices can cause a person to bleed to death, resulting in the person throwing up blood, but stated that because Nurse George didn't see any blood, there was no need to further investigate Brown's medical complaints.  *Id.* at 397-398. Similarly, a statement from detention officer Sours suggests that Nurse Krajca wanted verification that Brown had vomited blood.  Sours stated in his memo drafted on August 3, 2004 that, on the night Brown died, Nurse Krajca asked Sours whether anyone actually saw Brown throw up blood, to which Sours responded "Kaye, I had to clean it up."  Jt. App. at 162.

To the extent Defendant Callahan is attempting to argue that there was no underlying constitutional violation because Nurse Krajca and detention officers were entitled to ignore Brown's complaints, as no one with medical training verified that Brown vomited blood and inmates lie, this argument fails to achieve its goal.  The Court notes that there is no evidence suggesting that Brown fabricated any symptoms, and regardless, Nurse Krajca was told that Brown vomited blood by the jail's own detention officers and other inmates, not Jason Brown. There is evidence suggesting that Jason Brown was incoherent and unresponsive when the detention officers found him next to a puddle of vomit/blood.

Regardless, to the extent resolution of the issue of whether Brown vomited blood is

material, the Court finds such an issue is matter for the jury.  *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002).  Genuine issues of material fact exist regarding whether Defendant Callahan violated Plaintiffs' constitutional rights.  Plaintiffs have produced evidence suggesting that Nurse Krajca was aware that Brown needed medical attention, but failed to provide it.  In addition, Plaintiffs have produced evidence suggesting that policies adopted by Callahan, and/or situations that existed because of Callahan's failure to supervise, where why Nurse Krajca refused care.  Accordingly, the Court finds that fact issues exist regarding whether Defendant Callahan's acts or omissions violated Plaintiffs' constitutional rights.

The Court now considers whether, in light of these factual issues, Defendant Callahan is nevertheless entitled to summary judgment on his defense of qualified immunity.

### 3.        Qualified Immunity

In determining whether summary judgment on the ground of qualified immunity is appropriate, the Court first considers whether Plaintiffs have presented evidence raising a fact issue material to the resolution of the question of whether Defendant Callahan acted in an objectively reasonable manner in view of the existing law and facts available to him.  *See Lampkin v. City of Nacagdoches*, 7 F.3d 430, 435 (5th Cir. 1993).  If reasonable public officials could differ as to whether Callahan's actions were lawful, Callahan is entitled to immunity.  *See Malley*, 475 U.S. at 341 (1986).  "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable."  *Zarnow v. City of Wichita Falls, Tex.*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).  In addition, the Court must also consider whether Plaintiffs have raised an issue of fact regarding whether the

defense of qualified immunity is unavailable because the defendant is plainly incompetent or knowingly violated the law.  *See Malley*, 475 U.S. at 341.

After considering the evidence and the applicable law, the Court finds that genuine issues of material fact exist regarding whether Defendant Callahan acted in an objectively reasonable manner in view of the clearly established law, in light of the facts available to him, at the time of the conduct in question.  Plaintiffs have produced evidence raising genuine issues of material fact regarding whether Defendant Callahan knew that Dr. Bolin intimidated nurses and discouraged them from seeking emergency care for inmates with serious medical needs, and also knew that harm would result from such a policy.  In addition, Plaintiffs have produced evidence that Callahan adopted and/or acquiesced to this custom and failed to respond with any meaningful supervisory action.  Thus, the Court finds, based on the evidence before it, that Plaintiffs have raised a fact issue as to whether Callahan was objectively reasonable in view of the facts known to him, and in light of clearly established law, at the time of the conduct in question.[5]

Accordingly, Defendant Callahan's Motion for Summary Judgment is hereby **DENIED** as to Plaintiffs' claims under the Fourteenth Amendment.

**C.      Evidentiary Objections**

In addition to the affidavits of Pathena Tweed and Dawn Wilkinson, Defendant also objects to the Horowitz letter, the opinion of Dr. Keikbusch, and the affidavit of John R. Hyatte. Plaintiffs object to various statements within the affidavits of Defendant Callahan, Dr. Browne,

---

[5]The Court notes that it was clearly established at the time in question that pretrial detainees have a Fourteenth Amendment right not to have their serious medical needs met with deliberate indifference by jail officials.  *Hare,* 74 F.3d at 650.

and Gary Pinkerton.  As noted above in footnote 4, the Court declines to strike the affidavits of

Pathena Tweed and Dawn Wilkinson, but will not consider hearsay or speculation.  With respect

to the remaining objections, the Court overrules these objections as moot, as this evidence was

not relied upon in the Court's determination.

**D.      Punitive Damages**

Defendant Callahan argues that Plaintiffs cannot recover punitive damages from him for

any violation of 42 U.S.C. § 1983 because such damages are prohibited by the Texas Wrongful

Death Act and the Texas Constitution.  Plaintiffs contend that Texas law does not limit the

available damages in an action under section 1983.

The Fifth Circuit has held that because federal law does not address the availability of a

wrongful death remedy, courts look to state law authorizing wrongful death claims in assessing

whether a plaintiff has a cause of action under 42 U.S.C. § 1983.  *Brazier v. Cherry*, 293 F.2d

401 (5th Cir. 1961).  In *Baker v. Putnal*, the Fifth Circuit stated that "it is the law of this circuit

that individuals who are within the class of people entitled to recover under the Texas wrongful

death statute have standing to sue under § 1983 for their own injuries resulting from the

deprivation of decedent's constitutional rights." *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir.

1996).

Here, there is no dispute that Texas law entitles parents to maintain an action for the

wrongful death of their child, and therefore Brown's parents have standing to pursue their

wrongful death claims brought pursuant to 42 U.S.C. § 1983.  *See* Texas Constitution, Art. 16, §

26; Tex. Civ. Prac. & Rem. Code § 71.002.  In addition, there is no dispute that Texas law

prohibits parents from recovering punitive damages in wrongful death actions brought pursuant

24

to state law.  *See id.*  At issue is whether the prohibition on the recovery of punitive damages in wrongful death actions brought by parents pursuant to Texas law bars recovery of punitive damages in wrongful death actions brought by parents pursuant to 42 U.S.C. § 1983.  Neither party has presented a case squarely addressing this issue.

The Court finds it necessary to defer ruling and to require supplemental briefing on this issue.  The parties are hereby **ORDERED** to file a supplemental brief on this issue by **5:00 p.m. on August 18, 2009**.  The brief shall not exceed fifteen pages.

IV.    Conclusion

For the foregoing reasons, the Court finds that Defendant Callahan's Motion for Summary Judgment (Doc. # 126) should be and is hereby **GRANTED in part,** and **DENIED in part.**

The Court finds that genuine issues of material fact exist regarding Plaintiffs' claims under the Fourteenth Amendment brought pursuant to 42 U.S.C. § 1983.

The Court finds that summary judgment is appropriate with respect to Plaintiffs' claims under the Fourth Amendment brought pursuant to 42 U.S.C. § 1983, and these claims are hereby **DISMISSED with prejudice**.

**SO ORDERED** this **4**[th] day of **August, 2009.**

_____
**Reed O'Connor**
**UNITED STATES DISTRICT JUDGE**